## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | | |
|---|---|---|
| **DAVID M. FRIZZELL,** | ) | |
| | ) | |
| Petitioner, | ) | Case No. 7:20CV00685 |
| | ) | |
| v. | ) | **OPINION** |
| | ) | |
| **HAROLD W. CLARKE, DIRECTOR** | ) | JUDGE JAMES P. JONES |
| **DEPARTMENT OF CORRECTIONS,** | ) | |
| | ) | |
| Respondent. | ) | |

*David B. Smith, DAVID B. SMITH, PLLC, Alexandria, Virginia, for Petitioner; Liam A. Curry, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Respondent.*

David M. Frizzell, a Virginia inmate, brings this petition for habeas corpus pursuant to 28 U.S.C. § 2254, challenging his 2016 conviction by a jury for attempted murder of a police officer. The respondent has filed a Motion to Dismiss, to which Frizzell has responded. Upon review of the full record, I find that Frizzell's claims of ineffective assistance of counsel are procedurally defaulted and he has failed to overcome that default on all claims except one. The sole claim with merit to overcome the default is defense counsel's failure to object at trial to the prosecutor's argument as to the burden of proof on the issue of Frizzell's defense of intoxication. Even considering that claim on the merits, however, Frizzell has failed

to show the probability of a different outcome without this error. Therefore, I will grant the respondent's Motion to Dismiss.

## I. BACKGROUND.

### A. Procedural History.

Following a three-day jury trial, a Pittsylvania County Circuit Court jury on September 22, 2016, convicted Frizzell of attempted capital murder of Deputy Sheriff James Woods and use of a firearm in the commission of that felony. After closing argument at the sentencing phase, which Frizzell conducted on his own behalf, the jury recommended the minimum sentence allowed by law, twenty years for the attempted capital murder and three years for use of the firearm. On December 15, 2016, the court imposed the sentence recommended by the jury.

Frizzell appealed, arguing that the trial court erred in denying his motion to suppress, limiting his expert's testimony on premeditation, and refusing certain jury instructions. The Virginia Court of Appeals affirmed the convictions. *Frizzell v. Commonwealth*, No. 0028-17-3, 2018 WL 3541214, at *8 (Va. Ct. App. July 24, 2018) (unpublished). The Supreme Court of Virginia refused to hear a further appeal. *Frizzell v. Commonwealth*, No. 181092 (Va. Jan. 16, 2019) (unpublished). Frizzell did not petition the United States Supreme Court for certiorari.

On May 14, 2019, Frizzell filed a pro se petition for habeas corpus in the Supreme Court of Virginia, alleging numerous claims of ineffective assistance of

counsel. None of those claims are included in the current § 2254 petition. Two months after Frizzell had filed his petition, an attorney entered an appearance on Frizzell's behalf. However, as soon as the respondent filed a motion to dismiss Frizzell's pro se petition, his attorney filed a motion to withdraw, never having filed a substantive pleading or brief in the case. The court granted the motion to withdraw on October 11, 2019. Subsequently, the Supreme Court of Virginia dismissed Frizzell's habeas petition. *Frizzell v. Clarke*, No. 190629 (Va. Apr. 20, 2020) (unpublished).

On November 16, 2020, Frizzell, through counsel, timely filed the current petition, alleging the following claims of ineffective assistance of counsel:

1. Counsel's closing argument was ineffective because

   a. Counsel asked the jury to find Frizzell "not guilty" of capital murder, but did not ask for a lesser included offense;

   b. Counsel did not discuss malice, the element that distinguishes murder from manslaughter, nor its requirement that the offender's mind was "under the control of reason" at the time of the offense; and

   c. Counsel never related the trial evidence to the jury instruction on intoxication to explain how the law applied to the facts.

2.  Counsel failed to make proper objections to the Commonwealth's rebuttal argument, including

   a.  argument that was beyond the scope of rebuttal, nor did he request an opportunity for surrebuttal;

   b.  the Commonwealth shifting the burden of proof to the defendant on the issue of voluntary intoxication;

   c.  the Commonwealth arguing the natural and probable consequences of one's actions as if the inference of intent were a conclusive presumption; and

   d.  misstatements of fact and speculation about facts not in evidence.

3.  Frizzell was prejudiced by the cumulative effect of counsel's errors.

Pet. i–iii, ECF No. 1-1.

### B.  Evidence at Frizzell's Trial.

On October 30, 2015, Deputy Sheriff Jason Woods received a report while on patrol that a white sport utility vehicle was "doing doughnuts" in the grass of the park, tearing up the ground and spewing dirt and grass everywhere.  From the description of the SUV and its driver, Woods believed it to be Frizzell, whom he had met a year earlier.  After inspecting the damage at the park, Woods saw the SUV parked at a trailer park as he passed by; he sent a radio request for backup and turned around, but when he got back to the trailer park, the SUV was gone.  Woods then

4

headed towards the magistrate's office to seek a felony warrant for intentional destruction of property, but while driving, he saw the SUV again and noted that Frizzell was in the back seat, with a female driving and another male passenger in the front seat. The SUV pulled to the side of the road, and Woods activated his emergency lights and pulled in behind the SUV.

Frizzell got out of the SUV and walked to the driver's side, attempting to pull the driver out of the car and ignoring Woods' commands to get back in the car. The female, Juanita Haley (Frizzell's girlfriend at the time and now his wife), ran over to Woods and said, "I don't know what's wrong with him. He's drunk." CCR at 744.[1]  Woods then ordered Frizzell to step away from the vehicle. Frizzell looked at Woods and started walking in Woods' direction. The officer noticed that Frizzell's eyes were bloodshot, and he had a "blank" look on his face and was saying nothing. Woods drew his taser and pointed it at Frizzell, ordering him to stop walking. Frizzell kept walking, ignoring Woods' repeated commands to stop. When Frizzell was approximately six feet away from him, Woods tased him. Frizzell "tensed up" and started backing towards the SUV. He put his hand in his pocket and said, "Jason, you've done fucked up now." *Id.* at 752. Woods dropped his taser and

---

[1] All citations to proceedings in the Pittsylvania County Circuit Court record, Nos. CR16-357 and CR16-358, including the transcripts, will be abbreviated to "CCR," using the page number in the lower right corner of each page.

drew his gun, ordering Frizzell to remove his hand from his pocket four or five times. Frizzell suddenly pulled a gun from his pocket and fired it at Woods.

Witness Dantae Carter testified that it sounded like Frizzell "unloaded" the gun, firing until there were no more bullets. *Id.* at 911. Carter said he heard six shots in all. He was not sure if Woods fired any. Carter's brother Eric did not see the events, but he heard the shots; he estimated that he heard "around seven" shots. *Id.* at 933. Woods thought he fired only one shot but admitted that four shell casings from his gun were found at the scene, and one bullet struck Frizzell in the thigh. Frizzell did not appear to notice that he had been hit. Frizzell tossed his gun back into his SUV and continued standing beside the car, drinking a beer with a blank expression. Woods dropped his service revolver in the street and ran to the woods, according to Carter.

Meanwhile, Corporal Stevenson was responding to Woods' earlier request for backup when he heard Woods over the radio saying, "I've been shot, I've been shot, I need EMS." *Id.* at 883. Arriving within a minute and a half of receiving that radio transmission, Stevenson saw Frizzell standing by the SUV. He did not see Deputy Woods at all but saw two items in the road that could have been guns. The items were later identified as Deputy Woods' service firearm and taser. Stevenson retrieved an assault rifle from his patrol car and saw Frizzell begin walking towards him with what appeared to be a beer in his hand. Stevenson repeatedly ordered

6

Frizzell to stop approaching and to get on the ground with his hands in the air. Frizzell did not respond to the commands but kept walking slowly towards Stevenson with "a thousand-yard stare;" at one point, Frizzell asked, "Do you know who I am?" but said nothing more. *Id.* at 889. Finally, Frizzell turned around and retreated towards the car, allowing Stevenson to see that there was no gun in his other hand. Noting that Frizzell was already bleeding from a shot in his leg and seeing no need to escalate the situation, Stevenson lowered the assault rifle and used his taser instead, causing Frizzell to collapse to the ground. Woods suddenly appeared again and began cuffing Frizzell; when Frizzell jerked his second arm away while they tried to cuff him, Stevenson gave a second charge from the taser, after which Frizzell complied.

Once Frizzell was subdued and cuffed, Stevenson sat him up on the ground to await the EMT. Frizzell asked Stevenson to take the taster probes out of his back. Stevenson removed the probes, and the EMTs arrived and transported Frizzell to the hospital. Stevenson then determined that Woods had not been shot.

Virginia State Police officers investigated the scene approximately two hours after the incident. Special Agent Morris recovered Frizzell's revolver from the SUV. When he recovered the gun, he determined that it had the capacity to hold five bullets. Five empty cartridges were in the gun, indicating that five bullets had been fired, but he could not determine when the bullets had been fired. Morris recovered

7

a .40 caliber bullet from Deputy Woods' service gun from inside the driver door of the SUV. Morris also identified small holes in the front and back of an aluminum shed on the Carter property and on one side of the wooden shed on the Carter property, but he did not find any debris from a bullet around the sheds.

Maurice Carter testified that the holes had not been in his aluminum shed or the wooden shed before the shooting. Maurice saw the holes in the aluminum before Agent Morris arrived, but he found the one in the wooden shed after Morris was looking at the buildings. Maurice was walking out of the garage when the shots were fired, and he estimates that he heard more than two or three, maybe four or five shots. He did not hear any hit the aluminum building.

The defense recalled Special Agent Morris, who acknowledged finding four spent cartridge casings from Deputy Woods' weapon on the ground in the vicinity of the deputy's car. He reiterated that the bullet inside the SUV door also came from the deputy's gun. Morris also recovered samples of what appeared to be blood on the SUV's running board, the seat inside the SUV, and the road beside the SUV on the driver's side, all of which was Frizzell's blood.

Juanita Haley, assistant director of security at Averett University, testified that she was Frizzell's girlfriend and had been since 2010. When she first met Frizzell, he was a lieutenant at the police department in Reidsville, North Carolina. He retired from the police department in 2011 after twenty-six years of service, receiving

commendations.  After retirement, Frizzell became depressed and began drinking more, particularly after the stress of working with contractors to build their new home.  He was on prescription medication for depression until two or three months before the events of October 30, 2015.  During the six months before the confrontation with Deputy Woods, Frizzell drank daily, often to the point of passing out or forgetting things and becoming non-communicative.  Frizzell also started smoking marijuana.

On October 30, 2015, Haley and Frizzell went shopping before Haley went to work.  Frizzell purchased a bottle of Jim Beam and small bottles of vodka.  Haley saw him drink the Jim Beam.  While Haley was at work, Frizzell called several times, obviously intoxicated.  When Haley returned home in the afternoon, Frizzell and his SUV were gone; the house smelled like marijuana.  Haley decided to pack a suitcase and spend a day or two at her mother's home to avoid dealing with the situation. While driving towards her mother's house, Haley saw Frizzell pull out of the park, driving very fast.  She followed him, but lost sight of him for a moment because he was driving so fast.  Then she saw that Frizzell had pulled over into the driveway of a mobile home; the home's occupants and children, whom Haley had never met, were outside.  Frizzell was talking to the people, but she could not hear what he said; he was clearly very intoxicated.  Concerned that Frizzell was too intoxicated to drive, Haley asked the man, Steven Holland, if he would drive Frizzell's car home,

following Haley.  Holland agreed to do so.  Once they arrived at Frizzell's home, Haley drove Holland back towards his home in the SUV, with Frizzell in the back seat.

As Haley drove past the park, Frizzell said, "There's that cool racetrack I found earlier.  Pull over, go back."  *Id.* at 1201.  Approximately thirty seconds later and before reaching Holland's home, Haley saw Deputy Woods behind her and said, "There's Jason."  *Id*. at 1200.  Haley had previously been Woods' landlord, so they knew each other.  She pulled over and hollered, "It's me, Juanita."  *Id.* at 1201.  Then she noticed that Frizzell had gotten out and was coming around the back of the SUV.  Figuring that he wanted to drive, she quickly removed the key from the ignition so that he could not get to them.  Deputy Woods, using a loudspeaker, told Frizzell to get back in the vehicle; the blue lights on the deputy's cruiser were flashing.  Frizzell appeared oblivious and kept walking around to the driver's side, where he pulled Haley from the driver's seat.  Haley ran immediately to Deputy Woods' side,  telling him that Frizzell was drunk, but she [Haley] was driving, so everything was okay.  *Id.* at 1201–04.

Frizzell continued walking toward Haley and Woods, with a beer in his hand, not responding to Woods' repeated orders to return to his car.  Woods tased Frizzell, which caused Frizzell's face to contort, but otherwise did not have the effect Haley expected.  Then she saw Woods pull out his gun.  Haley begged Woods not to kill

Frizzell, saying that he was in an alcoholic blackout.  Haley did not see Frizzell's hands in his pockets, nor did she see Frizzell holding a gun.  She started to run across the street to hide behind another vehicle, because she did not want to see Frizzell killed in front of her.  Two seconds after she started running, she heard gunshots.  Once Haley got behind the vehicle across the street, she looked up and saw Woods running across the street to a house across from where she was.  Frizzell was standing beside his SUV.

Haley saw the second officer arrive on the scene and saw him carrying what looked like a shotgun.  She yelled for Frizzell to cooperate so he would not get killed, but Frizzell seemed oblivious, never responding to what she said or looking her way.  She lowered her head to pray and when she looked up, the officers had Frizzell in front of the SUV.  That is when she noticed that his pants leg was turning red from blood.  The officers would not allow her to speak with Frizzell.  He was transported to the hospital, and Haley was detained at the scene until state police officers arrived a couple of hours later to interview her.

Angela Holland testified that Frizzell's SUV pulled into the driveway near her trailer.  She and her four children went out to see who it was, because they did not recognize the car.  She had never seen the man before, and he had never been to her home before.  She first noticed that the driver, identified in court as Frizzell, was drinking alcohol, and the car was blaring music.  She also smelled urine and could

see that his pants were wet.  He asked to speak to the man of the house, and he was making "off the wall" comments.  *Id.* at 1241–45.  A couple of minutes later, another vehicle drove up, a Jeep, with a woman driving.  She had never seen this person before either, but Frizzell appeared irritated with the woman and told her to leave. The woman sat back in the Jeep but did not leave.  Ms. Holland's husband Steven arrived home within ten or fifteen minutes.  Steven spoke with the woman from the Jeep and agreed to drive Frizzell's SUV home, following the Jeep, so that Frizzell could not hurt anybody by driving drunk.

Steven Holland testified that he arrived home from work on October 30, 2015, around 6:00 p.m., to find his wife talking to a man and a woman that he had never met before.  The man appeared drunk and was acting strange, but not violent.  He ultimately agreed to help Ms. Haley get the man home safely and drove the SUV, following Haley.

While Haley was driving Holland back to his house, with Frizzell in the backseat of the SUV, they got pulled over.  Frizzell became fidgety and got out of the car.  Ms. Haley also got out, taking the keys with her.  Holland remained in the front passenger seat and did not look behind him to see what was happening.  He heard the officer tell Frizzell to get back in the car at least two or three times.  Then he heard the deputy say "get back, get back" several times.  *Id.* at 1258.  Then he heard the taser fire.  Holland saw Frizzell come back to the open driver's side door,

with his hand in his pocket.  Up until then, he had not heard Frizzell speak, but then Frizzell said, "Jason, don't fuck up, brother."  *Id.* at 1272.  He heard the deputy tell Frizzell a couple of times to get his hands out of his pockets.  He saw Frizzell take his hand out of his pocket and raise his arm, then the shooting started.  Holland could not tell who was shooting, because he had a limited view from inside the car.  He heard five or six shots in quick succession.  Then he saw Frizzell pull his arm down, and Holland first saw the revolver in Frizzell's hand.  Frizzell looked at the revolver with a puzzled look and then threw it in the back seat of the SUV.  Holland then got out of the car with his hands up, fearing that he, too, might get shot.  That is when he first saw the deputy, who was running, waving his arms, and acting strangely.  As Holland walked up the street to get out of harm's way, he saw the taser and the officer's pistol in the road.

Holland did not realize at that point that Frizzell had been shot.  He did not realize that the deputy had fired any shots.  From the deputy's behavior while running, he thought the officer had been shot.  Holland gave his name and contact information at the scene and got a ride home.  A couple of hours later, the state police came to his home to interview him.  On cross-examination, Holland admitted that when he called his wife, he said, "You're not going to believe it, this man just shot an officer," *id*. at 1264, because that's what he thought had happened.  He also acknowledged telling the police that Frizzell "unloaded" the revolver and then threw

it in the back, but he said he based that conclusion on what it sounded like, because he did not see the shots.  *Id.* at 1263–75.

The defense introduced medical records from Danville Hospital for Frizzell's treatment on October 30, 2015, by agreement of counsel.  The records showed a blood alcohol content of 0.20% and a positive test for the presence of marijuana.

Richard McGarry, a forensic toxicologist with over fifty years of experience, testified that based upon his review of the state police investigation and the medical records, the level of alcohol in Frizzell's system on the night of the incident would cause impairment in vision, coordination, muscle control, judgment, concentration, and divided attention tasks.  He further testified that the alcohol level was high enough that these effects would be noticeable even in an experienced drinker, notwithstanding tolerance.  Marijuana in the system causes giddiness and an inability to appreciate reality.  Synergistically, marijuana would amplify the effects of the alcohol as well as impair a person's awareness of his actions.

Franklin Russell, Ph.D., a clinical psychologist, testified that based on his training, experience, and review of the records of the investigation, a blood alcohol content of 0.20% would impair the functioning of the frontal cortex and could "significantly and adversely affect one's judgment, self-control, planning and rational behavior." *Id.* at 1374.  Because of the effects on the brain, a person so impaired would neither "think straight" nor plan ahead.  *Id.*  Marijuana affects a

14

person's perceptions and sense of reality, which adversely affects any decisions the person might make, and combined with the 0.02% blood alcohol level, would cause severe impairment in decision-making and reduction in impulse control, making the ability to premeditate unlikely.   The trial court excluded Dr. Russell's opinion that Frizzell lacked the ability to premeditate, because Russell's opinion was based in part on an interview with Frizzell, and Frizzell's testimony was not in evidence nor subject to cross-examination.

On cross-examination, Dr. Russell acknowledged that tolerance to alcohol and effects of alcohol can vary from person to person.  Dr. Russell further conceded that some of Frizzell's statements and behavior indicated an awareness of Deputy Woods' presence and identity, an awareness of Haley, and an awareness that the car had stopped moving.  He also noted, however, that some of Frizzell's other actions could demonstrate lack of awareness of where he was or who he was with.  On redirect, Dr. Russell elaborated that awareness does not mean ability to plan or premeditate. *Id.* at 1377–89.

Finally, the defense offered the testimony of character witnesses, Lieutenant Cathy Osborne and police canine trainer, Birgit Hall.  Lieutenant Osborne had known Frizzell since she first started working at the Reidsville police department, nineteen years earlier.  Ms. Hall had known Frizzell since 2009.  Both testified that he had a good reputation as an officer, particularly having concern for the safety and

well-being of new officers on the force.  Osborne had last spoken to Frizzell five months before the shooting, and Hall could not remember exactly when she had spoken to him, only that it had not been too long ago, because Frizzell had adopted three dogs from her at different times after he retired — retired police dogs that could not qualify for police duty.  *Id.* at 1391–1408.

The parties stipulated that forensic analysis of the bullet that had gone through the SUV's door revealed that it was a .40 caliber bullet, fired from Deputy Woods' duty firearm.  Before resting, the defense also introduced the downloaded taser report, showing that Deputy Woods' taser activated twice during the encounter with Frizzell.  *Id.* at 1441–43.

## II.  LIMITATIONS ON FEDERAL HABEAS.

A district court reviewing a § 2254 petition is limited by the separate but related doctrines of exhaustion, procedural default, and independent and adequate state law grounds.  These procedural doctrines promote the principles of finality, comity, and federalism, recognizing a state's legitimate interests in enforcing its laws, preventing disruption of state judicial proceedings, and allowing states the first opportunity to address and correct alleged violations of a state prisoner's federal rights.  *Coleman v. Thompson*, 501 U.S. 722, 730–31 (1991).

The doctrine of exhaustion requires a habeas petitioner to submit his federal constitutional claims to the highest state court, on the merits, before his claims can

be considered in federal court.  28 U.S.C. § 2254(b)(1)(A); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999).  Failure to do so "deprive[s] the state courts of an opportunity to address those claims in the first instance. *Coleman*, 501 U.S. at 732. Further, if the state court clearly denied a petitioner's claim based on a procedural rule that provides an independent and adequate ground for the state court's decision, the claim is procedurally defaulted for purposes of federal habeas review.  *Breard v. Pruett*, 134 F.3d 615, 619 (4th Cir. 1998).  A claim that has not been presented to the highest state court — and would be procedurally barred as untimely or successive if the petitioner tried to present the issue to the state court now — is defaulted; such defaulted claims are treated as if they had been exhausted, often referred to as simultaneously exhausted and defaulted. *Bassette v. Thompson*, 915 F.2d 932, 936– 37 (4th Cir. 1990).

Counsel for Frizzell acknowledges that his claims herein are new claims that have not and cannot now be presented to the Supreme Court of Virginia.  Pet. 15, ECF No. 1-1.  Thus, the claims are procedurally defaulted.  Before a federal habeas court will consider a procedurally defaulted claim, the prisoner must show both cause for the default and actual prejudice because of the claimed federal violation. *Coleman*, 501 U.S. at 750.  A special cause-and-prejudice rule applies to ineffective assistance of counsel claims in some circumstances.  *Martinez v. Ryan*, 566 U.S. 1, 13–15 (2012).  Under *Martinez*, the federal court can address a defaulted ineffective

assistance of counsel claim if (1) the claim is "substantial"; (2) the cause is the lack of counsel or ineffectiveness of counsel under the standards of *Strickland v. Washington*, 466 U.S. 668 (1984); and (3) in the state post-conviction proceeding the petitioner was required to raise the claim. *Moore v. Stirling*, 952 F.3d 174, 185 (4th Cir. 2020). Under this test, when state post-conviction proceedings are the first place one can raise ineffective assistance of counsel claims, then absence of counsel or ineffective assistance of counsel essentially establishes the cause for default. If the claim is substantial, meaning that it has some merit, that satisfies the prejudice prong. Even though a claim is substantial, that does not mean that a petitioner automatically prevails; a substantial claim is just part of the gateway for considering an otherwise defaulted claim for ineffective assistance of counsel. *Martinez*, 566 U.S. at 15–16.

Virginia limits ineffective assistance of counsel claims to post-conviction proceedings. *Hall v. Commonwealth*, 515 S.E.2d 343, 347 (Va. Ct. App. 1999). In his pro se petition in state court, Frizzell raised ineffective assistance of counsel issues, just not the same claims for ineffective assistance brought in this § 2254 petition. Thus, the third and fourth prongs of *Martinez* are satisfied.

The respondent argues that the *Martinez* exception should not apply because Frizzell had counsel for a portion of his state habeas proceeding, and he did not allege ineffective assistance of that counsel. Resp't's Br. Supp. Mot. Dismiss 9, 11,

13, ECF No. 9.  However, when Frizzell filed the petition on May 14, 2019, he had no counsel.  An attorney notified the court more than two months later that he would represent Frizzell, but other than that letter and his subsequent motion to withdraw, counsel never filed anything on behalf of Frizzell.  The state court's decision denying relief was entered more than six months after counsel withdrew.  Given that the petition was filed pro se, the attorney's involvement was brief, and the attorney played no substantive role in the habeas case, I find that Frizzell effectively had no counsel.  Accordingly, the second prong of *Martinez* is met.

The remaining question is whether any of Frizzell's claims can be considered substantial.  A claim is substantial within the meaning of *Martinez* if it has some merit.  566 U.S. at 14.  Each claim must be considered on its own merits.

### A. Claim 1: Counsel was Ineffective in Closing Argument.

Frizzell alleges that counsel was ineffective in delivering his closing argument because (1) he did not expressly ask the jury to find Frizzell guilty of a lesser-included offense, asking only that they find him not guilty of attempted capital murder; (2) he did not discuss malice, the element differentiating murder from manslaughter; and (3) that he did not relate the instructions to the evidence, particularly regarding intoxication and malice.  To prevail on a claim of ineffective assistance of counsel, a petitioner must show that counsel's performance was so deficient that he did not function as counsel guaranteed by the Sixth Amendment

and that the deficient performance prejudiced the defendant.  *Strickland*, 466 U.S. at 687.  If either prong is not shown, the petitioner cannot prevail.  In this case, Frizzell shows neither deficient performance nor prejudice, and therefore, the claim is not substantial.

Deficient performance requires a showing that counsel's performance fell below "an objective standard of reasonableness . . . under prevailing professional norms."  *Id.* at 688.  The reviewing court must not rely upon "the distorting effects of hindsight," but must presume that counsel's decisions and actions fell within the wide range of reasonable strategy decisions.  *Id.* at 689–90.  The Supreme Court has declared that review of counsel's closing argument must be highly deferential, especially when conducted on federal habeas review, where the court should be doubly deferential.  *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003).

Contrary to Frizzell's assertion, counsel's closing argument discussed the concepts of willfulness, deliberateness, and premeditation, and that these elements required a person to plan to do something on purpose after reflection.  CCR at 1480–81.  He specifically explained how the facts demonstrated that Frizzell was so intoxicated that he could not premeditate, referencing the testimony of Angela Holland and Steve Holland, describing Frizzell's irrational conversations and urine-soaked pants, to emphasize that Frizzell did not know where he was or what he was doing.  He reviewed the testimony describing Frizzell's apparent obliviousness to

flashing lights, being tased, and even having a .40 caliber bullet shot through his thigh. *Id.* at 1484–86. He noted Dr. Russell's testimony about the significant cognitive deficits one would have with Frizzell's blood alcohol level, including reacting without making decisions, without premeditation. *Id.* at 1487. He argued that the only evidence of premeditation was Woods' testimony that Frizzell said, "Jason, you've done fucked up now, brother," whereas Steve Holland, a stranger to Frizzell and the officer, testified that the words were "don't fuck up, brother," weakening the only asserted evidence of premeditation. *Id.* at 1489.

Counsel also emphasized the court's instruction on malice, twice mentioning that for malice to exist, the mind of the actor is under the control of reason. *Id.* at 1481–82. He described the effect on Frizzell of being zapped twice with a taser by Deputy Woods, first for seven seconds then for five seconds, just a few seconds apart, according to the taser report, arguing that Frizzell may have acted involuntarily in pulling the trigger. *Id.* at 1493–95.

Counsel covered other important points as well. He emphasized the presumption of innocence and the burden of proof beyond a reasonable doubt, for each element of a crime, at the outset. *Id.* at 1479. He pointed out discrepancies between the testimony regarding how many gunshots the witnesses heard, including Deputy Woods, Maurice Carter, and Steve Holland, and the physical evidence, showing that Woods fired four rounds, not one. *Id.* at 1497.

As in *Yarborough*, counsel's arguments covered several key points.  Unlike *Yarborough*, where the claimant identified other potential arguments defense counsel failed to make, the points Frizzell argues that counsel missed were in fact argued by counsel.  Perhaps they could have been argued some other way, or slightly more eloquently, but the "Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight."  *Yarborough*, 540 U.S. at 8.  Accordingly, claim 1 and its sub-claims a, b, and c are not substantial. I will dismiss those claims as procedurally defaulted.

### B.  Claim 2: Counsel was Ineffective in Failing to Object to the Prosecution's Rebuttal.

Frizzell asserts that counsel was ineffective in failing to object to four different aspects of the Commonwealth's rebuttal argument:  (a) the argument exceeded the scope of rebuttal; (b) arguing that the defense had the burden of proving intoxication; (c) arguing the inference that one intends the ordinary consequences of his actions as if it were a conclusive presumption; and (d) misstating the evidence and arguing facts not in evidence.  As with review of counsel's performance in delivering a closing argument, review of counsel's failure to object to a prosecutor's argument, even when that argument is improper, must be highly deferential, given the recognized tactical reasons that counsel may choose not to object.  *Bennett v. Angelone*, 92 F.3d 1336, 1349 (4th Cir. 1996).

*Exceeding the Scope of Rebuttal.*

Frizzell alleges that the prosecutor's rebuttal argument "was really the Commonwealth's closing argument, not proper rebuttal." Pet. at 40, ECF No. 1-1. However, he did not identify any arguments that were anything other than responsive to the arguments that defense counsel had made. Defense counsel did not find any of the arguments to be beyond the scope of rebuttal. Resp't's Br. Supp. Mot. Dismiss Ex. 7, Light Aff. 1–2, ECF No. 9-7. I do not find that any of the arguments were beyond the scope of rebuttal, even if the arguments were improper for another reason. Unsupported, conclusory allegations that the government exceeded the scope of rebuttal, without objection, are not sufficient to state a substantial claim for ineffective assistance of counsel. Accordingly, Frizzell has not overcome his procedural default.

*Misstating the Burden of Proof on Intoxication.*

No principle is more central to our system of criminal justice than that the prosecution must prove each element of a criminal offense beyond a reasonable doubt. *Patterson v. New York*, 432 U.S. 197, 215 (1977); *Mullaney v. Wilbur*, 421 U.S. 684, 699–700 (1975). As the trial court properly instructed the jury, to convict Frizzell of attempted capital murder, the prosecution had the burden of proving beyond a reasonable doubt that (1) Frizzell attempted to kill Deputy Woods; (2) the attempt to kill was willful, deliberate, and premeditated; (3) the attempt to kill was

malicious; and (4) the attempt to kill was of a law enforcement officer and for the purpose of interfering with the performance of his official duties.  CCR at 117. "Willful, deliberate, and premeditated" is an element, and so is malice.

Although not an affirmative defense to crime, voluntary intoxication to a sufficient degree may negate the element of deliberation and premeditation in first-degree murder cases.  *Morgan v. Commonwealth*, 646 S.E.2d 899, 902 (Va. Ct. App. 2007).  A defendant has the burden of coming forward with sufficient evidence of intoxication to warrant an instruction that intoxication may prevent deliberation and premeditation, but the burden of proving that the defendant's actions were willful, deliberate, and premeditated remains on the Commonwealth.  Shifting the burden of persuasion to the defendant violates the Due Process Clause.  *Mullaney*, 421 U.S. at 704 (holding it unconstitutional to place the burden of proof on defendant to prove heat of passion, because malice, an element of the offense, negates heat of passion); *McGhee v. Commonwealth*, 248 S.E.2d 808, 810 (Va. 1978) (noting that an accident cannot be willful, deliberate and malicious, and because the Commonwealth must prove willful, deliberate and malicious, the burden remains on the Commonwealth to prove that killing was not an accident).  "The Commonwealth's burden of proving an intentional homicide necessarily requires it to disprove any reasonable doubt that the killing was an accident."  *Myers v. Commonwealth*, 857 S.E.2d 805, 809 (Va. 2021) (citing *McGhee, 248 S.E.2d at 808*).

24

Before closing arguments began, the trial court properly instructed the jury on the law applicable to the case, including the elements of the offense, the presumption of innocence, the burden of proof, and the potential effect of intoxication on deliberation and premeditation.  During rebuttal, the prosecutor suggested that Frizzell had the burden of proof on deliberation and premeditation:

> [T]he law in Virginia says okay, if that's going to be the thing then we have, you have to prove, you have the burden now of proving that you were so drunk, not that it's substantially likely to impair, which is the mishy (sic), mushy words from the . . . psychologist . . . .But that's not the standard.  The standard is incapable, not that he's impaired. . . .

*Id.* at 1503–04.  This argument was made several times during the rebuttal:

> He's not making wise decisions but he's aware of what he's doing.  And that's the standard that we've got, that we need, it's the standard he has to prove that he's so incapable he's unaware of what he's doing.

*Id.* at 1516.

> And it was not voluntary intoxication because he cannot prove that he was incapable of doing it, incapable of premeditating.

*Id.* at 1531–32.

Defense counsel did not object to counsel misstating the burden of proof on any of these occasions.  He did not request a curative instruction from the court.  In trial counsel's affidavit, he acknowledges that the prosecutor shifted the burden of proof in his rebuttal argument.  Light Aff. 2, ECF No. 9-7.  Trial counsel further notes that the prosecutor had also argued the proper standard of proof, beyond a reasonable doubt, in other parts of its rebuttal, and that trial counsel in his closing

had covered burden of proof as well.  Finally, he believes that the jury took the written jury instructions into the deliberation room, so he felt no need to object to the prosecutor's burden-shifting.  *Id.*

Effective assistance does not require defense counsel to assert every potentially valid objection, and federal courts defer to counsel's decisions, presuming they are strategic, as advised by *Strickland*.  *Hansford v. Angelone*, 244 F. Supp. 2d 606, 613 (E.D. Va. 2002).  However, the court is not required to consider a decision as tactical if it makes no sense or is unreasonable under prevailing professional norms.  *Vinson v. True*, 436 F.3d 412, 419 (4th Cir. 2006).  Courts have long recognized that counsel might choose not to object to inadmissible evidence that the jury has already heard, because objecting might call attention to the very evidence that counsel wishes to exclude.  *See, e.g., Hodge v. Hurley*, 426 F.3d 368, 385–86 (6th Cir. 2005).  Other tactical reasons not to object include to avoid irritating the jury or to avoid appearing antagonistic or argumentative.  *Bennett*, 92 F.3d at 1349.

In the present case, where the prosecutor improperly states the burden of proof in a way that the Supreme Court has already held to violate due process, *Mullaney*, 421 U.S. at 704, I cannot find a reasonable tactical explanation for not objecting.  As the Fourth Circuit has stated, "[W]hat tactical reason could exist to allow the prosecution to advance improper arguments that are likely to result in the conviction

of one's client?"  *United States v. Mitchell*, 1 F.3d 235, 243 (4th Cir. 1993).

Accordingly, I find that this claim has merit, enough to overcome the procedural

default.  This claim will be addressed on the merits in Section III herein.

*Arguing a De Facto Conclusive Presumption of Intent.*

During rebuttal, the prosecutor argued:

> You have an instruction that says you intend the natural and probable
> consequences of your actions.  We don't have a statement from this
> defendant that says Jason, I'm going to kill you now.  And then starts
> shooting at him.  We never have those.  People almost never say that.
> But they get convicted because the law says you intend the natural and
> probable consequences of your actions.  If somebody comes in and says
> well, I, I was just trying to scare him when I was putting the bullet holes
> in him.  No, we know what the intent was. . . . [y]ou can now come in
> and try to say what your intent is but the intent is that you tried to kill
> him.  So you look at the natural and probable consequences of their
> actions.

CCR at 1516–17.  For the seven pages before that section of argument and ten more

pages after, the prosecutor was arguing every fact and inference from the evidence

that could lead a person to conclude that Frizzell intended to kill when he fired his

gun five times, including having his hand in his pocket for eight seconds before

pulling out the gun, saying don't fuck up, and the holes in the metal and wooden

sheds.  *Id.* at 1510–30.  He also talked about malice.  Near the end of his rebuttal, he

said:

> We have to prove that this defendant intended to kill.  You don't pull
> out a gun and point it at somebody and fire shots at them when they're
> standing here, and then when they dodge fire another shot over here,

27

and then fire three more shots that we never found, without having an intent to kill somebody.

*Id.* at 1527.

One might interpret the paragraph quoted above as suggesting that the law required a presumption of intent. Such a presumption is clearly not permissible. *Francis v. Franklin*, 471 U.S. 307, 314 (1985); *Sandstrom v. Montana*, 442 U.S. 510, 520–24 (1979). In *Francis* and *Sandstrom*, however, the court gave erroneous jury instructions regarding a mandatory presumption of intent. In *Francis*, the jury was informed that the presumption could be rebutted, but the Court held that the use of a presumption still unconstitutionally shifted the burden of proof to the defendant. 471 U.S. at 316. In this case, however, the trial judge properly instructed the jury that "You may infer that every person intends the natural and probable consequences of his acts." CCR at 116. A permissive inference does not relieve the state of its burden of proof; the state must still prove sufficient facts to warrant a jury concluding that the element has been proven by the state beyond a reasonable doubt. *Francis*, 471 U.S. at 315. Jury instructions from the court carry greater weight with jurors than do arguments of counsel. *Boyde v. California*, 494 U.S. 370, 384 (1990). The written jury instructions, along with exhibits, were provided to the jurors for use during deliberations.

Additionally, in the context of the full argument made, the prosecutor did not seek to switch the burden of proof to the defendant. Rather, he simply appealed to

the jurors' common sense by emphasizing all the evidence and inferences from the evidence that would support the logical conclusion that Frizzell intended to kill.  The line between permissible argument and that prohibited can be difficult to determine.  I am not prepared to say that the prosecutor crossed the line in arguing that "the law says you intend the natural and probable consequences of your acts."  In the context of the entire argument, the jury instructions, the evidence, and defense counsel's arguments, the comments did not "so infec[t] the trial with unfairness as to make the resulting conviction a denial of due process."  *Greer v. Miller*, 483 U.S. 756, 765 (1987) (citation omitted).  Accordingly, I find that this claim is not substantial, and Frizzell has failed to overcome his procedural default.

*Misstating the Evidence and
Arguing Facts not in Evidence.*

Frizzell lists several alleged misstatements of the evidence and incidents of speculation by the prosecutor that trial counsel did not object to:

1. That Deputy Woods only tasered Frizzell one time, not two.

2. That "'I know I shot at him' is . . . the evidence."

3. "Should I shoot him?  Should I shoot him?  Can I shoot him?  Yes, I can shoot him, I can shoot him. . . . He only had to make that decision one time" is speculation about what went through Frizzell's thoughts.

4. "I'm a police officer, they're not going to do anything to me" is speculation.

5. Speculating that Frizzell thought "I'm a retired cop. You, you shouldn't do anything to me," when he asked Officer Stevenson, "Do you know who I am?"

6. The prosecutor's analogies to movie scenes were "inapt [sic] and misleading."

Pet. at 36–37, ECF No. 1-1.

Whether Deputy Woods tasered Frizzell one time or two times was a disputed issue of fact. Deputy Woods thought he had tased Frizzell one time. Trial counsel was the one who told him that the report showed that the taser fired twice, but Woods had not seen that report at the time he testified at trial. Woods testified that he tased Frizzell; Frizzell tensed up and started backing to his car, then said, "You done fucked up now," and put his hand in his pocket. Woods dropped his taser and pulled out his service weapon when Frizzell ignored commands to remove his hand from his pocket. He testified that electricity from the probes ran for approximately five seconds when he fired the taser. Woods pulled his gun out as soon as Frizzell put his hand in his pocket; Woods estimated that Frizzell did not take the gun out of his pocket for eight to twelve seconds, and Woods had time to demand that he remove his hand from the pocket four or five times before the gun came out. CRR at 754, 805. The prosecutor was allowed to argue reasonable inferences from the evidence,

even if he was asking the jurors to accept the deputy's testimony rather than the taser report.

The second alleged misstatement, in context, is a permissible argument of inference. The prosecutor was highlighting that intoxication was the primary defense, not that "I didn't do it." It was permissible for a prosecutor to argue the inference that Frizzell was not disputing that he pulled the trigger, when the uncontradicted evidence was that he shot at Deputy Woods.

The statements regarding what may have been going through Frizzell's mind during the eight to twelve seconds before he pulled out his gun were obviously not statements of direct evidence, but a way of arguing to the jury that those seconds were sufficient time for premeditation. That Frizzell had time to premeditate and form an intent to shoot or kill was a reasonable inference from both the time delay and the act of pulling out a gun.

Likewise, arguing possible reasons other than intoxication for Frizzell to ignore officer commands to stop and return to his vehicle and later to ask Officer Stevenson, "Do you know me?" is a permissible argument of inferences from the evidence. One of the reasonable inferences that can be drawn from Frizzell's behavior and the overall circumstances is that he thought he would receive or should receive consideration as a retired police officer.

31

Finally, there was nothing prejudicial or misleading about the movie analogies that the prosecution used to explain his points in the rebuttal argument.  As for the movie analogies and the other statements discussed above, even if any of the arguments were somehow improper, they did not "infect[] his entire trial with error of constitutional dimensions."   *United States v. Frady*, 456 U.S. 152, 170 (1982).  As recently noted by the Fourth Circuit:

> Closing arguments are just that — arguments.  They are prone to exaggeration; we rely on juries and the adversarial process to place them in perspective.  The district court instructed the jury to trust its own recollections of the evidence, and that closing arguments were not evidence themselves.

*United States v. Sutherland*, 921 F.3d 421, 429 (2019).  While the prosecutor's argument may have been hyperbole, his summary of the facts and inferences to be drawn from them was not improperly prejudicial.  Further, the trial court properly instructed the jury that they were to determine the facts from the evidence and that the opening and closing arguments of counsel were not evidence.  Accordingly, I find that this claim is not substantial.  I will dismiss subclaims a, c, and d of Claim 2 as procedurally defaulted.

### III.  Merits Review of Remaining Claims.

#### A.  Failing to Object to Burden Shifting on Intoxication.

As Frizzell has correctly argued, if a petitioner overcomes procedural default on an issue, there is no state court decision on that issue for the federal habeas court

to defer to.  Rather, the court reviews the constitutional claim de novo.  *Gray v. Zook*, 806 F.3d 783, 789 (4th Cir. 2015).  Even with de novo review, however, a petitioner has a heavy burden to prove ineffective assistance of counsel under *Strickland*.  As previously noted, petitioner must prove both deficient performance and prejudice to the defendant.  *Strickland*, 466 U.S. at 687.

Deficient performance requires a showing that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms.  *Id.* at 688.  The reviewing court must not rely upon "the distorting effects of hindsight," but must presume that counsel's decisions and actions fell within the wide range of reasonable strategy decisions.  *Id.* at 689–90.  This is especially true when reviewing counsel's failure to object to the prosecutor's closing argument, given the numerous recognized tactical reasons for choosing not to object to an improper argument.  *Bennett*, 92 F.3d at 1349.

However, the court is not required to consider a decision as a tactical choice when there is no reasonable tactical explanation for not objecting.  *Vinson*, 436 F.3d at 419.  By misstating the burden of proof, the prosecutor was not asserting "bad facts" that the defense did not want to call attention to.  Misstating the burden of proof is not arguing the evidence, and counsel had a duty to object.  "When a defendant's lawyer is confronted with error during a judicial proceeding, he has the responsibility to object contemporaneously," so that the trial court can take

appropriate corrective action.  *United States v. Carthorne*, 878 F.3d 458, 464 (4th Cir. 2017).

Because "willful, deliberate and premeditated" was an element of the offense with which Frizzell was charged, the prosecution had the burden of proof.  If one is sufficiently intoxicated, such that the ability to premeditate may not exist, the burden remains on the prosecution to prove that premeditation occurred,  just as the burden remains on the prosecutor to prove malice in the face of evidence that the defendant might have acted in the heat of passion.  A law placing that burden on the defense is unconstitutional.  *Mullaney*, 421 U.S. at 704.   Once the defendant introduced evidence of intoxication, the burden was on the prosecution to prove that Frizzell nevertheless had the ability to premeditate.  *See id.*   Had the court improperly instructed the jury on this burden of proof, it would be error, perhaps structural error.  *See Francis*, 471 U.S. at 325.    Failing to object to repeated unconstitutional misstatements of the burden of proof falls below an objective standard of reasonable performance.

However, deficient performance alone is not enough to prevail on a claim of ineffective assistance of counsel.  Frizzell must also prove prejudice, "a reasonable probability that, but for counsel's unprofessional errors,  the result of the proceeding would have been different," which is "a probability sufficient to undermine confidence in the outcome."  *Strickland*, 466 U.S. at 694.  Arguments of counsel

"generally carry less weight with a jury than do instructions from the court." *Boyde*, 494 U.S. at 384.  Jurors likely view statements of counsel as advocacy, whereas jury instructions are the law.  I cannot say that there is a reasonable probability that objection from counsel to the misstatement of law would have affected the outcome of the proceedings.  The argument must be considered in context.  *Id.* at 384–85. The context here includes the proper instructions of the court, the thorough presentation of the defense evidence regarding intoxication, defense counsel's argument, and the prosecutor's acknowledgment that the Commonwealth had the duty to prove Frizzell intended to kill.

Because Frizzell has not established the prejudice prong of the ineffective assistance of counsel claim, I must dismiss the claim.

### B.  Claim 3: Cumulative Error.

As respondent correctly notes, Frizzell raised a cumulative error claim in his state habeas, but he was arguing cumulative error based on different claims from the ones raised in this § 2254 petition.  Whether I apply the standard of review deferential to the state court's decision or de novo review, the result here is the same.

Ineffective assistance of counsel claims must be reviewed individually; an attorney's actions or omissions that are not unconstitutional individually cannot be added together to create a constitutional violation.  *Fisher v. Angelone*, 163 F.3d 835, 852–53 (4th Cir. 1998).  The court further noted that "cumulative-error analysis

evaluates only effect of matters determined to be error, not cumulative effect of non-errors." *Id.* at 853.  Even when the court has considered cumulative error — generally on direct appeal — the court will reverse a conviction for cumulative error only "when the errors 'so fatally infect the trial that they violated the trial's fundamental fairness.'" *United States v. Woods*, 710 F.3d 195, 208 (4th Cir. 2013) (citation omitted) (declining to reverse a conviction even though finding two individually harmless errors).  Frizzell has only one substantive claim reviewed on the merits, making cumulative error inapplicable.

## IV. CERTIFICATE OF APPEALABILITY.

When issuing a final order adverse to a § 2254 petitioner, the court must issue or deny a certificate of appealability.  *See* Fed. R. Gov. § 2254 Cases 11(a).  A certificate of appealability may issue only if the movant has made a substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2).  The movant must show that reasonable jurists could debate whether the petition should have been resolved in a different manner based on the law or that the issues presented were sufficiently weighty to deserve encouragement to proceed further.  *See Miller-El v. Cockrell*, 537 U.S. 322, 338 (2003).  In the context of a procedural ruling, the movant must demonstrate both that the dispositive procedural ruling is debatable and that the action states a debatable claim of the denial of a constitutional right.  *Gonzalez v. Thaler*, 565 U.S. 134, 140–41 (2012).

I decline to issue a certificate of appealability because Frizzell has not made a substantial showing of the denial of a constitutional right and reasonable jurists would not find the court's procedural ruling to be debatable or wrong.

For the reasons stated, I will grant the Motion to Dismiss. A separate Final Order will be entered herewith.

DATED:   September 20, 2021

/s/ JAMES P. JONES
Senior United States District Judge